**Selam SELAH,**

v.

**Glenn S. GOORD, et al., Defendants.**

**No. 00–CV–644.**

United States District Court,
N.D. New York.

April 4, 2003.

Selam Selah, Warwick, NY, pro se.

Elmer R. Keach, III, Albany, NY, for Selam Selah.

Deborah A. Ferro, Office of Atty. General Dept. of Law, Albany, NY, for Defendants.

## DECISION & ORDER

McAVOY, District Judge.

Plaintiff Selam Selah (Plaintiff or Selah) brings this action challenging the New York State Department of Corrections (DOCS) policy of requiring mandatory tuberculosis skin tests of all inmates each year. Plaintiff contends that the DOCS policy violates his First Amendment Rights to free exercise of his chosen religion. Presently before this Court is Plaintiff's motion for a preliminary injunction preventing DOCS from administering the skin test to him during the pendency of this action.

This Court previously held in a Decision and Order dated January 2, 2002, that Plaintiff sincerely held his religious beliefs, and that DOCS policy burdened the exercise of his religious beliefs. *Selah v. Goord,* 2002 WL 73231 (N.D.N.Y. Jan.2, 2002). Following that determination, the Court held a two day hearing on March 20 and 21, 2002 in order to determine whether the policy of tuberculin hold is "reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).[1] At that hearing, the Court heard from Dr.

---

1. On consent of DOCS, Selah has been in the general population pending the outcome of this motion.

Lester Wright, Deputy Commissioner and Chief Medical Officer of the Department of Corrections; Dr. John Sbarbaro, Professor of Medicine at the University of Colorado (Deft.Ex. "6"); and Dr. Brobson Lutz, an infectious disease specialist from New Orleans who previously served as the Medical Review Officer for the City of New Orleans.[2] Plaintiff also testified regarding the conditions of his confinement while in tuberculin hold. Subsequently, the parties submitted the transcripts and videotaped testimony of Dr. Newton Kendig, the Medical Director for the Federal Bureau of Prisons (Deft.Ex. "9"), and Dr. Lee Reichman of the National Tuberculosis Center in Newark, New Jersey (Deft.Ex. "4").[3] The Court has reviewed all of this testimony, as well as the briefs submitted on behalf of the parties both before and after the hearing. The following constitutes the findings of fact and conclusions of law of the Court, as well as the Court's decision.

## I. Findings of Facts

### A. Tuberculosis and its control[4]

Tuberculosis is a highly infectious contagious disease. It is spread through the air. (Sbarbaro 19). It is caused by the tuberculosis bacillus or bacteria. For purposes of the issue before the Court, there are three types of tuberculosis infection. Latent tuberculosis exists when an individual has been exposed to tuberculosis and has contracted the disease. For various reasons, however, many individuals do not experience adverse effects from latent tuberculosis. The human body is able to contain the disease and the individual is not contagious. Nor will the individual exhibit symptoms of the disease. Active tuberculosis occurs when the body is not able to contain the tuberculosis bacillus, and the individual becomes ill. Tuberculosis can infect nearly every part of the human body. When an individual has active tuberculosis, the individual will exhibit signs and symptoms of the disease such as coughing, night sweats, chills and weight loss. (Lutz 138). Active contagious tuberculosis is a form of active tuberculosis where the infection exists in an individual's lungs. When an individual is infected with active tuberculosis of the lungs, the individual is capable of spreading the disease to others through the shared air space.[5]

In theory, latent tuberculosis could convert to active contagious tuberculosis at any time. As a practical matter, five to ten percent of people with latent tuberculosis will develop active tuberculosis during the course of their lifetimes. (Sbarbaro 56; Reichman 18). In HIV patients this number is higher. (Reichman 18). In a person with a normal immune system, between two to five percent of the people will convert to contagious tuberculosis during the first year. (Reichman 19; Lutz 137). There is also an increased risk during the second year, though it is not as great.

---

2. Dr. Wright and Dr. Sbarbaro were called by the defendant. Dr. Lutz was called by plaintiff. The exhibits referenced are the ciricula vitae of the various witnesses.

3. Dr. Reichman was called by the defendant. Dr. Kendig testified as a non-party witness. The Court has not detailed the qualifications of any of the experts here; rather, reference is made to the witnesses' ciricula vitae. The testimony of the parties is referenced by each person's last name and the page of the transcript corresponding to the testimony.

4. The Court is cognizant that the explanations given here are simplifications. Reference is made to the record for precise testimony regarding the tuberculosis disease.

5. Although at least one expert testified that tuberculosis in other areas of the body can be contagious, for purposes of the prison setting, it is pulmonary tuberculosis that is of concern. *See* Sbarbaro 27.

(Lutz 137). The remaining individuals will convert their tuberculosis status from latent to active during some other period of their life. (Lutz 137).

An individual with contagious tuberculosis will infect about 20 to 25 percent of his contacts with some form of tuberculosis. (Sbarbaro 30; Reichman 20). In a congregate living situation, such as a prison, tuberculosis spreads more easily. (Sbarbaro 32). Factors affecting this include the high rate of HIV infection, the number of people from countries outside the United States, the close living conditions, and the high stress level. (Sbarbaro 33).

### B. Testing

#### 1. PPD

The current test for detecting latent tuberculosis infection is the Purified Protein Derivative Test, or PPD ("PPD" or "skin test"). This involves the injection of a substance containing a derivative of tuberculosis between the layers of the skin. (Sbarbaro 36). If an individual has a reaction to the injection that includes a thickening of the skin with a measurable induration, the individual has likely been infected with latent tuberculosis.[6]

The PPD test, as it is used in the prison setting, has several purposes. First, it is a screen test to monitor a large population of people for latent tuberculosis infection. (Lutz 139). Second, it allows people with latent tuberculosis to receive treatment for tuberculosis infection before they become contagious. Finally, it allows a population to be monitored for changes in the tuberculosis status of the prisoners. The Court notes that the PPD test takes forty-eight hours to administer. Consequently, it is

not effective for short term populations, for populations with a great deal of movement, or for populations that have a high incidence of other diseases. (Lutz 144; Sbarbaro 100).

There is some concern over the accuracy of the test. False positives are possible with the PPD test. About fifteen percent of tests will be false positives due to related diseases. (Sbarbaro 38; Reichman 107).

In a person without active tuberculosis or HIV, about 2–5 percent of the tests will be false negatives. Some of these occur when the test is given too soon after infection. False negatives typically occur, however, when the body is unable to respond to the PPD test because the immune system has been compromised in some way, such as cancer or HIV/AIDS, (Sbarbaro 39; Reichman 110), or the individual already has active tuberculosis. (Lutz 139; Sbarbaro 181).

Perhaps the greatest problem with the test is that it is subject to human error when the test is read. (Sbarbaro 97). Depending on who is reading the test and how the reader measures, there can be a number of false positives or negatives. (Lutz 140; Reichman 111). Consequently, all of the experts believed that health professionals who are going to be reading the test need constant training on how to read the test, or they tend to do poorly at reading it. (Reichman 158). In DOCS, facility nurses or infection control nurses read the test. (Wright 200). Nurses are trained when hired. They are provided regular refresher courses in reading the

---

6. Reading the PPD test is an imprecise science. An induration of 15 mm. on an average person means a likelihood of tuberculosis infection. In a congregate setting, however, a base of 10 mm. might be used instead. Similarly, in a contact trace, where there is a known source of potential tuberculosis infection, a base of 5 mm. might be used for a determination of tuberculosis. Sbarbaro, 38. DOCs policy uses the 5 mm. base. *See* Deft. Ex. "6", p. 6.

PPD test, and everyone was given a system wide refresher in 2000. (Wright 200).

Another problem with the PPD test is that once an individual has tested positive with the test, he or she will always test positive. (Sbarbaro 40). Consequently, the test cannot be used again to determine the status of that individual. Indeed, even if an individual is successfully treated for latent or active tuberculosis, the PPD test will remain positive.

### 2. X-rays

X-rays are generally used to detect active tuberculosis disease. (Lutz 138). About 2–10 percent of people with latent tuberculosis will show scarring on their lung tissue that can be picked up by an x-ray. In contrast, active contagious tuberculosis in individuals with a normal immune system can be picked up 90–95 percent of the time by an x-ray.[7] Defendant's expert has noted that an x-ray cannot predict the future likelihood that an inmate will develop active TB, nor is it particularly good for the detection of latent tuberculosis. (Reichman 35).

### 3. Sputum Tests

If an individual appears to have active tuberculosis, a sputum smear is taken. (Sbarbaro 68–69). A sputum smear followed by a sputum culture are the gold standard for determining whether an individual has active, contagious tuberculosis. (Lutz 138). In this process, an individual's phlegm is analyzed under a microscope for signs of TB. Reichman 31. The process of a sputum culture takes approximately 6–8 weeks. (Reichman 31). The experts disagreed as to the likely cost of a sputum culture and no evidence of the cost was

provided to the Court. However, the cost at a state lab is somewhere between $10 and $35 and at a private lab it is somewhere between $35 and $60. (*Compare* Lutz 154; Sbarbaro 180).

### C. Treatment

Latent tuberculosis can be treated with Isoniazid, (INH) [8] administered for a 9–12 month period. Its side effects include tiredness and hepatitis or liver problems, particularly in those over the age of thirty-five. (Sbarbaro 49). INH treatment reduces the risk of an individual converting latent tuberculosis to active disease significantly, perhaps as much as 90 percent. (Reichman 26 (90 percent); Kendig 64 (70–90 percent)). However, even with treatment, individuals can have their tuberculosis reactivate, particularly if they are or become HIV positive. In such cases, the individual would become contagious even with prior treatment. (Sbarbaro 104).

### D. DOCS Policy

### 1. Testing

When an inmate enters DOCS, he is tested with the PPD test and a chest x-ray. The chest x-ray ensures that active disease that is detectable is not being introduced into the prison. The individual is then tested each year with the PPD test. (Wright 196). The only individuals not given the PPD test are those who have a documented positive PPD test. (Wright 195–96). A documented positive test must be in writing by a health professional and must include the date of the positive test and the number of millimeters of induration. (Wright 195). There is some risk

---

7. In an individual infected with HIV, there is a thirty to sixty percent failure rate with x-ray. Sbarbaro 180.

8. The Court notes that INH is short for Ionaizad, the most common drug used in the treatment of latent TB. The Court is aware that INH is not the only drug used in treatment of latent TB and uses the term INH here only as a short-hand way of identifying the treatment for latent tuberculosis. *See* Wright 198.

associated with these individuals who come into DOCS with a positive PPD but do not have the test repeated, particularly if HIV is also involved. (Wright 301–302). To combat this risk, these individuals have a note written in their charts regarding their PPD status, including when they tested positive and what the millimeter induration was. (Wright 303). They are monitored annually for signs and symptoms. They are not, however, x-rayed or given sputum tests. (Wright 303).

## 2. TB Hold

An inmate who refuses the PPD test is counseled regarding the importance of the test. (Wright 195–197; TB Policy, Def. Ex. "5"). If the inmate continues to refuse, he is placed in tuberculin hold. The inmate is regularly offered the test, and is monitored for the presence of active disease. (Wright 196). Assuming an inmate continues to refuse to take the PPD test, he or she will be kept in tuberculin hold for one year. (Wright 197). An inmate may leave tuberculin hold at any time by having the PPD test performed. An inmate is also able to leave after one year on tuberculin hold and three clean chest x-rays six months apart. (Wright 197). While on tuberculin hold, the inmate is monitored for signs and symptoms every month, including a monthly weigh-in. (Wright 259). The individual is not, however, given a sputum test. (Wright 259). After one year, an inmate is evaluated on an annual basis, through an observation examination which looks for signs and symptoms of the disease. (Def.Ex. 6, p. 5). Chest x-rays are not done on an annual basis. (Id. at p. 6). The inmate will not be required to take the PPD test again unless he is a part of a contact trace. That is, unless the inmate was directly exposed to a known transmission of tuberculosis. Inmates on tuberculin hold are permitted one hour of solitary exercise a day, three showers a week, and legal visits.

No telephone calls or personal visits are permitted. (Id.).

The individuals on TB hold have their status indicated in their medical charts and on computer record. An infection control nurse is assigned to each facility, and these cases are assigned to this nurse. (Wright 261). A computer print out each month tells the nurse which inmates on tuberculin hold should be seen by the nurse. (Wright 261).

Similarly, if an inmate converts from a negative to a positive skin test, or has a positive skin test on entry to DOCS, the inmate is treated with chemoprophylaxis treatment (INH). (Wright 198). If the inmate refuses INH, or is unable to take INH, he or she is placed on tuberculin hold. Assuming the individual is HIV negative, he or she is removed from tuberculin hold after one year. (Wright 199). If the individual is HIV positive, the inmate is kept in respiratory protective status indefinitely and closely monitored. (Wright 199).

One year was chosen by DOCS because of the increased risk of conversion from latent tuberculosis to active tuberculosis in the first year. (Wright 202). Dr. Wright testified that since the system seemed to be working, there was no need to be more restrictive, or keep an inmate on hold during the second year, despite the increased risk in that year. (Wright 202). The Court notes that the increased risk alluded to by Dr. Wright applies *only* in the first or perhaps second year following the initial infection. About 23–25 percent of the individuals coming into DOCS already have a positive PPD test. (Wright 205). For those individuals, and for individuals such as plaintiff who have had prior negative PPD tests without any reason to think a conversion has occurred, the one year time period is largely irrelevant.

It is important to note that inmates on tuberculin hold show no active signs of disease. (Wright 199). Individuals with signs of active tuberculosis are immediately placed in respiratory isolation. (Wright 199). Dr. Wright previously testified in another matter that individuals with latent tuberculosis are not a health threat to others in the facility. (Wright 274).

### 3. TB Hold for Selah

No specific information regarding the air system in Auburn Correctional Facility or any other place of Plaintiff's incarceration was provided. Dr. Wright testified that the regular ventilation system in Auburn takes air from the galley, or area outside the inmates cells in through the cells and exhausts it out the vent in the back. (Wright 200). Plaintiff testified only that no additional changes were made to the air system of his cell once he was placed on tuberculin hold.

Plaintiff also testified that he was kept in his regular housing unit or cell. (Selah 5). This is confirmed by the Tuberculosis policy. Plaintiff's cell had bars on cell doors. Outside of his cell was an area that was open not only to his own housing unit but also to the other floors and cells of his housing block. Selah 5–6. Plaintiff received his meals by having food brought to his cell. Selah 7. Plaintiff also testified that other inmates would come by to see him. (Selah 7–8). He testified that the inmates would trade food (Selah 8), that he would make them sandwiches in exchange for candy bars, which he could not, himself, obtain (Selah 8). Plaintiff also testified that he was allowed to participate, to a limited extent, in gallery recreation, where individuals would play cards with the others on their cell block and would talk and eat together. (Selah 9). Finally, Plaintiff testified that he used the same telephones

and showers as other inmates, though not at the same time. (Selah 9)

### E. Expert's Testimony regarding DOCS Policy

### 1. Dr. Sbarbaro

Dr. Sbarbaro suggested three rationale for the current tuberculin hold policy of DOCS. The first, is that it fostered increased monitoring of the individuals whose PPD status was unknown. The second was that it limited the contacts of those with unknown PPD status. The third was that it increased the likelihood an individual would be treated for latent tuberculosis. He suggested that DOCS should prioritize its risks as PPD positive persons who were untreated; PPD unknown persons; PPD positive but treated individuals; and PPD negative individuals. (Sbarbaro 66). He also pointed out that a diagnosis of active tuberculosis disease could only be made thirty to sixty days after the infection occurred. (Sbarbaro 69). Consequently, during that first sixty days, the only way to tell if an inmate had been infected was through the PPD test. When pressed on cross-examination, Dr. Sbarbaro stated that the only difference between a person on tuberculin hold who was monitored and a person in the general population who was monitored was the number of potential contacts in the case of the actual spread of tuberculosis disease. (Sbarbaro 79–80). He also testified that the best way to monitor for active contagious disease would be a chest x-ray every three months, increased monitoring for signs and symptoms of tuberculosis, and a sputum test every six months. (Sbarbaro 117, 182). He noted that it was absolutely necessary for a person with an unknown PPD status to receive increased monitoring. (Sbarbaro 58–61, 65, 72).[9] Finally,

---

**9.** Dr. Sbarbaro would apply the same increased monitoring to individuals who tested positive but refused INH treatment. Sbarbaro 58–61, 65.

Dr. Sbarbaro testified that tuberculin hold was a positive step because an individual could be asymptomatic and still be contagious to others. (Sbarbaro 169).[10]

### 2. Dr. Lutz

Dr. Lutz testified that the tuberculin hold policy as written did not make sense because the individuals who potentially had latent tuberculosis were not contagious to others. (Lutz 156). He stated that tuberculin hold was, in his opinion, unnecessary, and that what is of greater importance is weekly or monthly weigh-ins and increased monitoring of the individual. (Lutz 152–154). He also recommended x-rays every three to six months and a sputum culture every six months. (Lutz 154). He tended to disagree with Dr. Sbarbaro's belief that an individual could be spreading the disease without showing signs or symptoms of it. *Id.*

### 3. Dr. Wright

Dr. Wright's testimony echoed Dr. Sbarbaro. He testified that the rationale for tuberculin hold was to coerce some people into taking the test and to limit the number of contacts of someone who did not take the test, but became infectious. (Wright 202; 233). He testified that there was no significant cost difference between monitoring an individual who had refused the test while that individual was on tuberculin hold and monitoring the individual in the general population. (Wright 313).

### 4. Dr. Reichman

Dr. Reichman was the only expert who found the DOCS tuberculin hold policy to be too lenient. He testified that the time

on hold should last two years. He also repeatedly testified that since the system is working, it should not be changed. (Reichman 46). Dr. Reichman did not articulate any reason for the use of tuberculin hold other than to coerce prisoners into taking the PPD test. He repeatedly stated that exceptions harm the system, though he did not elaborate on this statement. (Reichman 53, 139, 147). Yet, Dr. Reichman also testified that an inmate with a positive PPD but no signs of tuberculosis on an x-ray and a negative sputum culture would not be a threat to other prisoners. (Reichman 66).

He stated that the purpose of requiring skin testing is to flag a chart so that an individual can be monitored for signs and symptoms of tuberculosis. (Reichman 50). He agreed with DOCS policy of giving a PPD positive person a chest x-ray and treatment with INH if possible. (Reichman 55). He did not believe that an x-ray alone was adequate because it will only help diagnose an individual who has active tuberculosis, not latent tuberculosis. (Reichman 64). However, the only way to tell when latent infection has become active contagious tuberculosis is with monitoring of the patient. (Reichman 138). Dr. Reichman echoed the sentiment of Dr. Sbarbaro, that if there were signs and symptoms of the disease, the individual was already contagious and the disease was being spread. (Reichman 162). Despite having consulted on numerous tuberculosis prevention programs, Dr. Reichman could not recall ever having recommended something similar to tuberculin hold.[11] (Reichman 156).

---

**10.** There is some disagreement as to the reality of this risk. *Compare* Sbarbaro 169 (risk of contagious without symptoms); Lutz 154 (unlikely that individual becomes contagious without symptoms); Wright 274 (infected individuals no risk to prison population); Kendig 38, 45 (no risk to prison population from latent infected inmates); Reichman 66 (clean x-ray and sputum means no risk to other inmates).

**11.** Dr. Reichman could not remember the specifics of any of the recommendations he had made. Reichman 91.

### 5. Other Reports and Statistics

The Health and Human Services Guidelines make no mention of tuberculin hold or any similar program. The Guidelines recommend that persons exempted from the PPD test should have x-rays. (Wright 237–38). There is approximately a 1.39 percent likelihood that an inmate who has previously been negative will convert his skin test to a positive. (Wright 241). Additionally, only 3.5 people in DOCS develop active tuberculosis each year. (Wright at 244). There were 11 cases of tuberculosis in 2000, the last year for which DOCS has statistics. (Wright 244). Dr. Wright testified that he believed there are fewer than ten people who have made religious objections to the PPD test. (Wright 296). At any time, there has been a maximum of sixty people on tuberculin hold. (Wright 297). He did not, however, have any statistics regarding how many of those people refused the PPD test versus the number who are on tuberculin hold because they have refused INH treatment. Dr. Wright also noted that much of the tuberculosis control in the New York State prison system came from Rikers Island and other jails prior to the entry of inmates to the prison system. (Wright 324).

### 6. Kendig–The federal policy

Dr. Kendig testified regarding the policy of the Federal Bureau of Prisons (BOP) with regard to tuberculosis testing. Federal inmates are tested using the PPD test on entry to the BOP. They are then tested annually thereafter. The purpose of testing is to detect and treat active tuberculosis and latent infection and to detect new transmissions of tuberculosis. (Kendig 7). PPD tests are done unless they are medically contraindicated, such as an inmate who has blistering when being tested. (Kendig 10).

Dr. Kendig did not know whether there were any individuals who had refused the PPD test on religious grounds, but testified that he believed the BOP policy was to make no exceptions for religious reasons. (Kendig 33–34). He stated that an inmate who refused would be counseled as to the importance of the test. If the inmate still refused, he would be issued a misbehavior report for failure to obey an order. (Kendig 15–16). Dr. Kendig did not know what the result of the misbehavior report would be, but did state that it would be evaluated on an individual basis. Kendig 16, 17. On a case-by-case basis, some inmates who still refuse are given chest x-rays and are set up for regular symptom screening and close clinical monitoring. (Kendig 12, 16). Inmates may, however, be subject to involuntary testing if medically indicated. (Kendig 27). An inmate who refuses to take the test is returned to his cell. (Kendig 68). Failure to take the PPD test the following year can result in disciplinary sanctions again. (Kendig 82).

The BOP does not require a patient to take treatment for latent tuberculosis, though each inmate with latent tuberculosis is counseled to take INH. (Kendig 43). An individual who refuses treatment for latent tuberculosis is given chest x-rays every six months. If the inmate is HIV positive, then the inmate is monitored even more closely. (Kendig 40). The inmate is tracked in the health computer system. (Kendig 44). There is no disciplinary sanction for failing to take INH. The inmate is not separated from the general population unless he shows symptoms of the disease. (Kendig 41).

Dr. Kendig testified that an individual with latent tuberculosis, or one who clearly does not have contagious tuberculosis is not a threat to other prisoners. The BOP does a great deal of air transportation of prisoners. In order to be transported between prisons, an inmate must have a negative chest x-ray and no symptoms of

tuberculosis. (Kendig 38). In order to detect active tuberculosis, a chest x-ray and clinical examination are used, with a possible sputum test follow up. (Kendig 38).

Dr. Kendig testified that he would find it to be a medically acceptable alternative to give INH to an inmate who refused to take the PPD test as a part of a contact trace. (Kendig 80). He would, however, first want to ensure that the contagious individuals had, in fact, infected at least some other inmates or personnel prior to allowing a refuser to take INH. (Kendig 80). In the BOP, refusers of the test and refusers of INH are both given chest x-rays and increased clinical monitoring. (Kendig 79).

Dr. Kendig testified that he never considered isolating individuals with latent tuberculosis who are not receiving INH and who are not showing signs of active disease. He testified that there was no medical reason to isolate them except during the time the individual is being screened for active disease. (Kendig 45–46). Further, he testified that there was no reason to confine a refusing inmate to his cell unless there was a medical indication that the individual might reactivate his latent tuberculosis. (Kendig 48–49).

## II Conclusions of Law

### A. Preliminary Injunction Standard

■ A party seeking a preliminary injunction has the burden to show: (1) that he will suffer irreparable harm in the absence of an injunction and (2) either a likelihood of success on the merits or sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in the movant's favor. *Zervos v. Verizon New York Inc.*, 252 F.3d 163, 172 (2d Cir.2001) (quoting *Polymer Technology Corp. v. Mimran*, 37 F.3d 74, 77–78 (2d Cir.1994)). When the movant is challenging government action that is for the bene-

fit of the public, the movant must meet the "likelihood of success" standard. *Latino Officers Ass'n. v. City of New York*, 196 F.3d 458, 462 (2d Cir.1999) (citations omitted); *see also Reynolds v. Goord*, 103 F.Supp.2d 316, 334 (S.D.N.Y.2000).

The Court has already determined that Selah will suffer irreparable injury. *See Selah v. Goord*, 2002 WL 73231 (N.D.N.Y. Jan.2, 2002) (citing *Paulsen v. County of Nassau*, 925 F.2d 65, 68 (2d Cir.1991)) (citations omitted) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Consequently, this decision is limited to Selah's likelihood of success on the merits.

### B. Prison Regulations and the First Amendment

■ In order to succeed at trial, the Plaintiff must prove that he "sincerely held" the religious beliefs professed by him, and that he was denied reasonable accommodation for the exercise of his beliefs. *Jackson v. Mann*, 196 F.3d 316, 319 (2d Cir.1999); *Reynolds*, 103 F.Supp.2d at 334. This Court has already determined that Plaintiff sincerely holds his religious beliefs. *See Selah v. Goord*, 2002 WL 73231 (N.D.N.Y. Jan.2, 2002). Thus, the issue before the Court is whether DOCS policy is rationally related to legitimate penological interests. *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). The Court considers four factors in this regard. First, there must be a valid rational connection between the regulation and the government interest. The government interest must also be legitimate and neutral. Second, prisoners must be given alternative means of exercising their religion where possible. Third, the Court must consider the impact an accommodation of the right will have on the prison system. Finally, the Court must

consider whether there is a reasonable alternative available to the prison. *Turner,* 482 U.S. at 89–90, 107 S.Ct. 2254.

Clearly DOCS has a legitimate interest in stopping the spread of TB in its prisons. Thus, in this case, the Court must consider whether the policy of placing inmates who refuse a PPD test on religious grounds into tuberculin hold for one year is rationally related to the interest of DOCs, the impact on the prison system if an injunction is issued, and whether alternatives are available to DOCS.

### C. Burden of Proof

Before this Court can address the merits of this action, the Court must determine whether DOCS has the burden of proving the regulation reasonable or whether Plaintiff has the burden of proving the regulation unreasonable. In this regard, it appears that the law is not settled. *Compare Davis v. City of New York,* 142 F.Supp.2d 461, 465 fn. 14 (S.D.N.Y. 2001) ("Once plaintiff has made a *prima facie* showing that his free exercise right has been impinged, the City bears the burden at trial of proving the rationality of the alleged restrictions, the legitimacy of its penological goals, and the absence of available alternatives.") *with Breland v. Goord,* 1997 WL 139533, at *3 (S.D.N.Y. Mar.27, 1997) ("The burden is on the plaintiff to demonstrate the unreasonableness of the regulation at issue.") (citing *Giano v. Senkowski,* 54 F.3d 1050, 1054 (2d Cir. 1995)).

■ As a practical matter, the Court finds that defendants must come forward with some rational basis for the policy at issue. *See Breland,* 1997 WL 139533, at *3 ("There must be some showing by the defendants that the regulation does promote the claimed penological objective."). Plaintiff cannot be expected to "guess" what rationale DOCS would provide. Further, if DOCS fails to articulate a rational

connection between the policy at issue and legitimate penological interests, the Court need go no further. *See Brown v. Johnson,* 2003 WL 360118, at *5 (W.D.N.Y. Feb.14, 2003) ("If the connection between the regulation and the asserted goal is 'arbitrary or irrational,' then the regulation fails, irrespective of whether the other factors tilt in its favor.") (quoting *Block v. Rutherford,* 468 U.S. 576, 586, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984)). Where, however, DOCS has articulated a reasonable connection between the policy and legitimate penological interests, it then falls to Plaintiff to show the availability of other alternatives that are less burdensome to his religion and yet, equally effective for DOCS purposes. *See O'Lone v. Shabazz,* 482 U.S. 342, 350, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (error to require correction officials to disprove alternatives. Officials need only show reasonable connection.); *Turner,* 482 U.S. at 90–91, 107 S.Ct. 2254 (officials not required to disprove all alternatives). Thus, the burden is ultimately on the Plaintiff. *See Giano v. Senkowski,* 54 F.3d 1050, 1054 (2d Cir. 1995).

### D. DOCS Legitimate Reasons

DOCS has put forward several rationales for the policy of placing prisoners who object to the TB skin test in tuberculin hold for a year. First, the confinement coerces prisoners into taking the test. (Wright 202, 233). Second, it limits the exposure of other individuals to the objector during the most critical first year. (Wright 313; Sbarbaro 79–80; Reichman 59, 162). Third, it fosters better monitoring. (Sbarbaro 58–61, 117, 182; Reichman 50). Fourth, it allows DOCS to identify and treat ill inmates early. (Sbarbaro 169; Reichman 55). The Court will examine each of these in light of the evidence.

### 1. Coercion

■ There are three times an inmate will be required to take a PPD test: upon his initial entry to DOCS, annually thereafter, and if he is part of a contact trace. For each of these, the goal of coercion would be relevant. It is, however, clear to this Court that coercing reluctant prisoners to take the skin test does not take a year. The conditions of tuberculin hold are such that a reasonable prisoner would quickly consent to the PPD test absent a matter of conscience. Selah has consented to a shorter stay on TB hold, one that would allow the results of a sputum test to come back prior to release. Consequently, the Court finds that requiring inmates to serve longer than that amount of time is not reasonably related to the goal of coercing inmates to take the test.

### 2. Monitoring

■ Each expert who testified identified monitoring for signs and symptoms as the best way to determine whether an individual had changed his status from latent to active. DOCS third and fourth reasons relate to the monitoring abilities of doctors and nurses. Dr. Sbarbaro has claimed that monitoring individuals is easier if they are confined to their cells. This is, however, directly contradicted by Dr. Wright who testified that there would be no greater cost or effort to monitor the prisoners if they were in general population. (Wright 313). In fact, when on tuberculin hold, an inmate resides in his normal cell on his normal cell block. The individual is identified through a tag to his chart, and not through his location in the prison. Conse-

quently, the Court does not find any legitimate connection between tuberculin hold and increased monitoring.

### 3. Limiting Contacts

■ DOCS' most persuasive argument is that limiting an objector to tuberculin hold limits the number of individuals who are exposed to the objector. Limiting the exposure of other prisoners to the objectors is most relevant following a contact trace. The time frame of tuberculin hold is such that it minimizes the harm that could be done by an individual who has contagious tuberculosis but exhibits no outward signs or symptoms. Although a number of experts testified that inmates with latent tuberculosis were not a threat to the health of other inmates, the Court finds that DOCS *may* have legitimate reason to consider the public health concerns that *might* result if an inmate is contagious but shows no signs. Consequently, the Court does not find that it is more likely than not at this time that DOCS policy is arbitrary and irrational as it relates to contact traces.[12]

■ This goal of limiting exposure is also of relevance when inmates are first introduced to the prison setting. Until DOCS has knowledge of the individual's status, and whether he is likely to infect other people, it appears at this time to be reasonable to isolate the objector as much as possible. That DOCS permits some contact between the individual and other people does not destroy this goal. Certainly it is easier to control an outbreak where the objector comes into contact with

---

12. Selah has suggested as an alternative, that the inmate be allowed to take INH without first determining his status. The experts were sharply divid,ed on this issue. Because the Court does not find it necessary to address this alternative for purposes of Selah's preliminary injunction, it is not addressed here. Selah will, however, likely want to develop this or other similar arguments for trial inasmuch as he could, at some future time, become part of a contact trace. The Court also notes that there is some dispute over whether confinement to a cell is rational at all. This point, was, however, not sufficiently developed by either side.

25 people than where the objector is in contact with 100 people. Consequently, tuberculin hold for objectors on initial entry to DOCS appears rational to this Court.[13]

■ There is, however, a third category of inmates. Inmates, such as Selah, who, after taking the PPD test or having their status determined in some other way, subsequently object to the annual testing on religious grounds. For Selah, the policy appears entirely arbitrary and irrational. For instance, the Court can find no difference between an inmate who has completed a year on tuberculin hold, and is thus excused from annual testing, and Selah, who has previously been determined to be negative.

There is no greater need to limit Selah's contacts than that of the person who has left tuberculin hold, or the person who refuses INH and is allowed to return to the general population after one year. Selah's chart can be tagged in the same way as a person who is wholly unable to take the PPD test, allowing him to be monitored for signs and symptoms of the disease in the same way. Additionally, Selah has not objected to x-rays or sputum testing, should DOCS desire to annually monitor Selah in that way. While the Court accepts that these methods are not ideal, and may not even be useful for some inmates, they provide an alternative to Selah equal if not superior to DOCS current method for monitoring inmates who cannot take the PPD test for whatever reason. Selah's alternatives are also equal to the monitoring provided to inmates who have already finished one year on tuberculin hold.

Consequently, it appears to this Court that while Selah may not succeed in his broad challenge to all of DOCS policy, the policy as applied to him in his circumstances is irrational.

## B. Impact on the Prison Setting

DOCS has advanced two additional arguments the Court will also address. Both relate to the impact an accommodation of Selah's rights will have on the prison at large.

### 1. Standard

■ The Court, in determining whether the alternative proposed by Selah is reasonable must also consider the impact on the prison. *See Ford v. McGinnis*, 2000 WL 1808729, at 1 (S.D.N.Y. Dec.11, 2000). Thus, the court should consider the impact of accommodation on "other inmates, on prison guards, and on the allocation of prison resources generally." *Nicholas v. Miller*, 189 F.3d 191, 194 (2d Cir. 1999). The Court has already addressed the cost issues associated with Selah's proposal and has found that there is unlikely to be any affect on prison resources from a cost standpoint. Two other issues have been raised before the Court that also must be addressed. The first is the safety and health of inmates and prison officials. The second is the idea that a decision in Selah's favor here will result in a "flood" of religious objectors.

### 2. Health and Safety of Inmates

■ Dr. Sbarbaro testified that inmates with latent tuberculosis posed a threat to inmates at large. The majority of the experts, however, testified that tuberculin hold, as it is constructed, did not help alleviate this possible threat. Indeed, Dr. Wright has testified on other occasions that an inmate with latent tuberculosis is

---

13. Initial entry to DOCS is different than entry to a new DOCS facility. Transfer between facilities does not implicate the same concerns inasmuch as the inmate will have already been tested or held in tuberculin hold at the entry facility.

not a threat to other prisoners. (Wright 274). Dr. Kendig testified that the BOP does not confine objectors to their cells and that he did not believe it served any medical or prison health purpose. (Kendig 38, 45). Even Reichman testified that an inmate with a clean x-ray and negative sputum test was not a threat to other inmates. (Reichman 66). Additionally, the Court in *Jolly v. Coughlin* found that persons with latent tuberculosis were of no threat to the prison population, a finding that was affirmed by the Second Circuit. *Jolly v. Coughlin*, 894 F.Supp. 734, 744 (S.D.N.Y.1995), *aff'd* 76 F.3d 468 (2nd Cir. 1996). Consequently, while the Court is not entirely convinced that an inmate who contracts latent tuberculosis at a known time, or one whose tuberculosis status is entirely unknown, poses no threat to other prisoners, that is not the case here. In the case of Selah, the Court finds that Selah is likely to be able to show that allowing an exemption for him from the PPD test will not pose a threat to other inmates.

### 2. Flood of religious objectors

DOCS has also advanced the argument that allowing Selah to have a religious objection will open the floodgates of religious objectors. As evidence for this, DOCS points to three cases that have been filed in the Northern District of New York since *Reynolds v. Goord* was decided in 1999. Interestingly, however, DOCS has no statistics on the number of religious objectors to the PPD test. Further, the Court has not seen a "floodgate" of religious objectors either since the Second Circuit's decision in *Jolly,* or since the Southern District's decision in *Reynolds.*[14] If, as DOCS seems to contend, only three cases have been filed in the three years following *Reynolds,* DOCS concern is entirely unfounded. Additionally, DOCS failure to keep any statistics indicates that

there is no flood of inmates seeking to claim religious objections. Consequently, the Court finds that it is more likely than not that Selah will be able to show there is no negative impact on the prison setting by his religious exemption.

### III. Conclusion

For the foregoing reasons, the Court finds that Selah has established that it is likely he will prevail on the merits of his action. Consequently, he is granted a preliminary injunction.

**IT IS SO ORDERED.**

---

**14.** This argument was specifically rejected in *Jolly v. Coughlin,* 894 F.Supp. at 745.